**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MICHAEL MANNING, as the Administrator of the Estate of Terence Crutcher, Sr.,

Plaintiff - Appellant,

v.

CITY OF TULSA; BETTY JO SHELBY,

Defendants - Appellees.

No. 24-5058

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:17-CV-00336-EFM-SH)**

---

Karin S. Portlock of Gibson, Dunn & Crutcher LLP, New York, New York (Lee R. Crain, Aiyanna Isom, Julia T. Ross, and Mary Otoo of Gibson, Dunn & Crutcher LLP, New York, New York; Claire V. Madill of Gibson, Dunn & Crutcher LLP, Washington, D.C.; and Damario Solomon-Simmons of SolomonSimmonsLaw, Tulsa, Oklahoma, with her on the briefs), for Plaintiff-Appellant Michael Manning.

Jeffrey C. Hendrickson (Randall J. Wood, Robert S. Lafferrandre, and Jessica L. Dark with him on the brief) of Pierce Couch Hendrickson Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for Defendant-Appellee City of Tulsa.

Scott B. Wood of Wood, Puhl & Wood, P.L.L.C., Tulsa, Oklahoma, for Defendant-Appellee Betty Shelby.

---

Before **HARTZ**, **McHUGH**, and **MORITZ**, Circuit Judges.

---

**MORITZ**, Circuit Judge.

---

In 2016, Officer Betty Shelby of the Tulsa Police Department (TPD) shot and killed an unarmed Black man, Terence Crutcher, in Tulsa, Oklahoma. The administrator of Crutcher's estate, Michael Manning (the Estate), sued Shelby for excessive force under 42 U.S.C. § 1983. The Estate also brought claims against the City of Tulsa under both state law and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court dismissed the *Monell* claims, finding the Estate failed to plausibly allege municipal liability. It then granted summary judgment to Shelby based on qualified immunity. Considering no federal claims remained at that point, the district court dismissed the state-law claim against the City.

We reverse in part and affirm in part. Because the district court failed to view the facts in a light most favorable to the Estate and erred in analyzing clearly established law by defining the right at issue too narrowly, we reverse its grant of summary judgment to Shelby. But we affirm the district court's dismissal of the *Monell* claims. On remand, the district court should consider whether exercising supplemental jurisdiction over the state-law claim is appropriate.

**Background**

As dusk settled over the streets of Tulsa one evening in September 2016, Shelby was on her way to a domestic-disturbance call.[1] She drove past a Black man

---

[1] We take these facts from the parties' summary-judgment pleadings, noting where they are disputed.

on foot who she believed was either on PCP or experiencing a mental-health crisis because "[h]e had a distant look on his face and appeared zombie[-]like." App. vol. 2, 260. The man had moved off the road and was not impeding traffic, however, so Shelby drove on.

Several hundred feet later, she came across an SUV parked in the middle of the road with its engine idling. Shelby stopped, got out of her patrol car, and walked to the SUV. Looking through the driver's side windows, she examined the rear compartment, the back seat, and the front seat. She saw no individuals and no weapons inside. As she walked around to the passenger side and looked back, she saw the Black man from earlier—Terence Crutcher—walking up the street toward her parked patrol car and the SUV. Shelby yelled to him, asking if the SUV was his, but he didn't respond. Instead, Crutcher began walking towards her, and she yelled at him to take his hands out of his pockets. He mumbled something in response and then slowly put both hands in the air. According to Shelby, Crutcher's "head was positioned downward[,] and he was sweating profusely." *Id.* at 229.

Crutcher either followed Shelby's orders by keeping his hands up, or he periodically put them back in his pockets.[2] As Crutcher neared Shelby's patrol car, she radioed, "[H]old traffic. I have a suspect that won't show me his hands!" *Id.* at 230. Shelby then ordered Crutcher to get on his knees and show his hands.

[2] This fact is disputed in part because Shelby did not activate her dashcam or any body-worn recording device.

The culmination of the encounter was captured on camera—both from a helicopter above and from the dashcam of a second officer who arrived on scene. Crutcher continued walking slowly towards the parked SUV with his hands in the air. With her gun pointed at Crutcher's back, Shelby followed him and again ordered him to stop. Officer Tyler Turnbough heard her commands as he arrived on scene, and he pulled his taser as Crutcher reached the driver's side of the SUV. Turnbough announced, "Taser, I have my [t]aser," and thought he heard Shelby respond, "[O]kay." *Id.* at 285.

Simultaneously, Shelby fired her gun and Turnbough discharged his taser. Turnbough's taser temporarily paralyzed Crutcher while Shelby's bullet entered just below Crutcher's right armpit. He fell to the pavement and was pronounced dead less than an hour later.

In June 2017, the Estate sued Shelby and the City of Tulsa.[3] As relevant to this appeal, the Estate brought a Fourth Amendment excessive-force claim against Shelby, a wrongful-death claim under Oklahoma law against the City, and *Monell* claims against the City for unconstitutional policies and practices resulting in Crutcher's death. The *Monell* claims focus on an overall culture and custom of excessive force, encouraged by deficient training in the use of force, flawed hiring practices, and inadequate officer-misconduct investigations and discipline. The Estate

[3] The Estate also sued Turnbough and the TPD Chief of Police, but those defendants are not party to this appeal.

also alleged an equal-protection violation premised on a policy, practice, custom, or culture of intentional racially disparate enforcement.

The district court granted the City's motion to dismiss the *Monell* claims as inadequately pleaded. Later, the district court granted Shelby's motion for summary judgment based on qualified immunity. Because no federal claims remained, it declined to exercise supplemental jurisdiction over the state-law wrongful-death claim against the City, dismissing that claim without prejudice.

The Estate appeals.

## Analysis

The Estate asks us to reverse the district court's grant of summary judgment to Shelby on its excessive-force claim based on errors in the district court's qualified-immunity analysis. The Estate also argues that we should reverse the dismissal of its *Monell* claims against the City. We consider each issue in turn.

## I. Excessive-Force Claim Against Shelby

The Estate sued Shelby under § 1983, which imposes civil liability for constitutional violations committed by state officials. It alleged that Shelby violated Crutcher's Fourth Amendment right to be free from unreasonable seizures by using excessive force. But Shelby invoked qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). When a defendant invokes

qualified immunity, "[t]he plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right had been clearly established by the time of the violation."[4] *Id.* at 1164. Courts are free to address these prongs in either order and may grant qualified immunity if the plaintiff fails to meet either one. *See Pearson*, 555 U.S. at 236. Here, the district court chose to address only the second prong, ruling at summary judgment that any constitutional violation was not clearly established.

We review that decision de novo. *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). In doing so, we view "the evidence in the light most favorable to [the Estate] and resolve all factual disputes and draw all reasonable inferences in [its] favor." *Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023). And we will affirm summary judgment here only if "there is no genuine dispute as to any material fact and [Shelby] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We first discuss the relevant disputed facts and then consider each prong of the qualified-immunity test.

---

[4] Noting a circuit split on the issue, the Estate additionally argues—for preservation purposes alone—that the defendant should bear the burden of proving a constitutional right is clearly established. But as it recognizes, we are bound by our precedent, which places the burden on the plaintiff. *See, e.g.*, *Tenorio*, 802 F.3d at 1164.

**A. Factual Disputes**

Before analyzing the qualified-immunity prongs, we address the key disputed facts. Because the Estate is the nonmoving party, we must adopt its view of the disputed facts for purposes of this appeal. *See Torres*, 60 F.4th at 600.

To begin, we consider whether Crutcher complied with police commands to show his hands: Shelby says he made "continuous hand movements to his pockets," Shelby Aplee. Br. 16, but the helicopter video—which captured the critical seconds leading up to the shooting as Crutcher approached the SUV—suggests otherwise.[5]

Next, the parties dispute the position of the driver's window of the SUV. Shelby and Turnbough say they fired because they thought Crutcher was reaching through the window to retrieve a weapon. Based on the amount of blood on the outside of the driver's window and the absence of blood inside the SUV, however, the Estate maintains that the window was at least "mostly rolled up, which would have prevented [Crutcher] from being able to reach" inside the SUV. App. vol. 3, 410.

Relatedly, the parties disputed the precise position of Crutcher's arms at the moment Shelby shot him. The district court sided with Shelby on that point, finding

[5] The Estate also suggests that the district court improperly resolved the issue of Crutcher's compliance with Shelby's commands to "stop moving, [to] get on his knees, and to show his hands." App. vol. 3, 637. But the district court's observation that Crutcher "ignored orders to stop and get on his knees as he slowly walked away . . . with his hands up" merely describes what can be seen in the helicopter video. *Id.* at 643. Crutcher did not stop and get on his knees; he kept walking with his hands raised.

that "Crutcher did at least lower his arm" before she fired. *Id.* at 637. But the helicopter video doesn't clearly show Crutcher making such a movement. Shelby directs us to a blurry screenshot that supposedly shows Crutcher's left arm reaching through the window at the moment she fired. According to Shelby's own expert, however, her gun discharged in frame 1003 of that video, and the screenshot Shelby cites is of frame 1118. So whatever the image shows, it can't help us determine the position of his hands *before* he was shot.

Moreover, even if frame 1118 had captured the moment of the shooting, it is far too blurry to find that Crutcher *undisputedly* lowered his arms before Shelby fired. At summary judgment, we must accept the nonmoving party's version of a material fact unless it is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Frame 1118 doesn't come close to providing the necessary degree of clarity. The pixelated, birds-eye-view image fails to contradict the Estate's assertion that Crutcher's hands were raised—let alone refute it so compellingly that no reasonable jury could believe it. Absent such a contradiction, we must follow the Estate's version of events and assume Crutcher did not lower his hands.

We therefore proceed from this starting point: despite Crutcher's partial compliance with police commands, Shelby shot Crutcher while he was standing with his hands up, unarmed, next to the mostly rolled-up driver's side window, no weapon within reach.

### B. Constitutional Violation

The Estate argues Shelby violated Crutcher's Fourth Amendment right to be free from excessive force. "An officer's use of force is unconstitutional if it is 'objectively unreasonable' as 'judged from the perspective of a reasonable officer on the scene.'" *Clerkley v. Holcomb*, 121 F.4th 1359, 1364 (10th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). Courts assess reasonableness based on the totality of the circumstances, paying "particular attention to three factors identified in *Graham*: '(1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of the officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (cleaned up) (quoting *Graham*, 490 U.S. at 396).

When a case involves deadly force, courts consider four additional factors (known as the *Larsen* factors) that guide their assessment of the threat a person posed: "(1) 'whether the officers ordered the [person] to drop his weapon[] and the [person's] compliance with police commands'; (2) 'whether any hostile motions were made with the weapon towards the officers'; (3) 'the distance separating the officers and the [person]; and (4) 'the manifest intentions of the [person].'" *Baca v. Cosper*, 128 F.4th 1319, 1325 (10th Cir.) (quoting *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)), *cert. denied*, 146 S. Ct. 354 (2025); *see also Clerkley*, 121 F.4th at 1364 (noting that Tenth Circuit uses *Larsen* factors to assess threat posed by person for purposes of second *Graham* factor).

Here, all three *Graham* factors point in the same direction: that Shelby's use of force was unreasonable. The first factor—the severity of the crime—favors the Estate, considering that Shelby suspected Crutcher of public intoxication and obstruction. These offenses are at most "non[]violent misdemeanors," as the district court noted. App. vol. 3, 643; *see also* Okla. Stat. tit. 21, § 540 (defining misdemeanor obstruction); Tulsa, Okla., Ordinances, tit. 27, § 700 (punishing public intoxication with fine). That "weigh[s] against the use of significant force." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 763–64 (10th Cir. 2021).

The same is true of the second *Graham* factor—the immediacy of the threat—as illuminated by the four *Larsen* factors. *See Graham*, 490 U.S. at 396; *Larsen*, 511 F.3d at 1260. There was no reason for Shelby to think Crutcher had a weapon, so the first and second *Larsen* factors necessarily favor the Estate. Shelby didn't need to order Crutcher "to drop his weapon," and Crutcher didn't need to "compl[y]" with that directive, because he wasn't holding anything dangerous (indeed, he raised his hands at Shelby's request). *Larsen*, 511 F.3d at 1260. Likewise, Crutcher couldn't make "any hostile motions" with a weapon he wasn't holding. *Id.* As for the third *Larsen* factor, the ten-foot "distance separating" Shelby and Crutcher strongly weighs against the use of force, given Crutcher's lack of a weapon. *Id.*; *see also Est. of Harmon v. Salt Lake City*, 134 F.4th 1119, 1127 (10th Cir. 2025) (finding five-to-seven-foot distance to suspect armed with knife "didn't necessarily create an imminent threat"). And on the fourth *Larsen* factor, the undisputed facts do not suggest that Crutcher, who had walked slowly toward the SUV with his hands in the

air, "manifest[ed any] intent[]" to harm Shelby or anyone else. *Larsen*, 511 F.3d at 1260. Together, these factors demonstrate that Crutcher posed even less of a threat than in a case like *Walker v. City of Orem*, where we concluded that using deadly force against a man holding a knife to his own wrist was unconstitutional. 451 F.3d 1139, 1160 (10th Cir. 2006).

Last, we reach the third *Graham* factor—whether the person was actively resisting arrest or attempting to evade arrest by flight. *See* 490 U.S. at 396. This, too, favors the Estate because Shelby's own expert said that Crutcher "was not aggressively or actively resisting" or "fleeing." App. vol. 3, 574. At most, Shelby's expert said Crutcher was being "passively noncompliant." *Id.* But such a "low level of resistance . . . 'does not justify a severe use of force in response' under this factor." *Krueger v. Phillips*, 154 F.4th 1164, 1198–99 (10th Cir. 2025) (quoting *Surat v. Klamser*, 52 F.4th 1261, 1275 (10th Cir. 2022)).

Shelby offers little to counter this analysis. She neither directly addresses prong one of the qualified-immunity analysis nor uses the *Graham* and *Larsen* factors to assess her use of force. Moreover, her briefing regularly fails to view the facts in the light most favorable to the Estate. For instance, she repeatedly recites that the window was rolled down and that Crutcher was reaching through it to grab a gun. But as we have explained, those are disputed facts, so we must assume that the window was mostly rolled up and that Crutcher was not reaching into the SUV or lowering his hands. Doing so, we conclude that the evidence supports the Estate's claim that Shelby violated Crutcher's constitutional rights by using unreasonable force.

**B. Clearly Established**

At prong two, we consider whether the right Shelby violated was "clearly established"—meaning "confirmed by Supreme Court or Tenth Circuit precedent or the overwhelming weight of authority from other courts." *Finch v. Rapp*, 38 F.4th 1234, 1240 (10th Cir. 2022). In defining "clearly established" rights, we tread a fairly narrow path. On the one hand, the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). On the other, "because excessive[-]force jurisprudence requires an all-things-considered inquiry with 'careful attention to the facts and circumstances of each particular case,' there will almost never be a previously published opinion involving exactly the same circumstances." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (cleaned up) (quoting *Graham*, 490 U.S. at 396).

Ultimately, we need not engage in "a scavenger hunt for prior cases with precisely the same facts" to conclude that officials were "on notice of clearly established law." *Packard v. Budaj*, 86 F.4th 859, 869 (10th Cir. 2023) (quoting *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)). Instead, officers are put on notice of our decisions through their training and education and must draw commonsense parallels between the facts of prior cases and those they encounter in the field. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (rejecting requirement that cases be "fundamentally similar" and explaining "officials can still be on notice that their conduct violates established law even in novel factual circumstances").

The Estate contends that the district court fell victim to the scavenger-hunt mentality by defining the right at issue too narrowly and improperly disregarding cases it cited below. We agree. In determining whether the right violated was clearly established, the district court framed the question with rigid specificity:

> [Whether] an officer can[] use deadly force on a suspect who[] has diminished capacity; was in an open, unconfined area; reportedly committed only non[]violent misdemeanors; ignored orders to stop and get on his knees as he slowly walked away from an officer towards a parked vehicle with his hands up; and when he reached the door of the vehicle lowered his arm.

App. vol. 3, 643. Of course, this account fails to assume that Crutcher kept his hands raised when he reached the door of the vehicle. But leaving that aside, the district court's articulation of the issue systematically recites the facts of this case and this case alone, straying into the forbidden territory of requiring "fundamental[] similar[ity]." *Hope*, 536 U.S. at 741.

As the Estate argues, the proper iteration of the right is broader and hinges on the use of deadly force against an unarmed individual who poses no threat. Unlike formulations we have rejected as too broad—for instance, the overarching principle that officers can't use excessive force—"[t]his formulation of the right meets the clearly established test by avoiding generalities in favor of a right tailored to the essential facts of this case." *King v. Hill*, 615 F. App'x 470, 477 (10th Cir. 2015).[6] Indeed, that is exactly how subsequent cases have framed the right. In *Finch*, we

---

[6] We rely on *King* for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

explained it was clearly established "that an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect." 38 F.4th at 1243. And in *Clerkley*, we noted it was "clear . . . that an officer responding to a potentially dangerous situation could not use deadly force against an unarmed, nonthreatening person."[7] 121 F.4th at 1367.

This right was clearly established years before Shelby shot Crutcher in 2016. In *Tennessee v. Garner*, the Supreme Court established the baseline principle that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. 1, 11 (1985). In *Zuchel v. Spinharney*, we upheld the denial of qualified immunity where an officer shot a man holding nail clippers who was neither charging the officer nor stabbing at him. 890 F.2d 273, 274–76 (10th Cir. 1989). We reached the same result in *Zia Trust Co. ex rel. Causey v. Montoya*, where an officer shot the driver of a van stuck on a pile of rocks when the driver revved the engine and the vehicle jumped forward. 597 F.3d 1150, 1152–53 (10th Cir. 2010). So too in *Walker*, a 2006 case, where police shot a reportedly suicidal man who was holding a knife to his own wrist and did not threaten officers.[8] 451 F.3d at 1160.

[7] We are free to cite precedent that postdates the underlying incident in determining the appropriate level of generality for purposes of the clearly established inquiry. *See, e.g.*, *Wise v. Caffey*, 72 F.4th 1199, 1209 (10th Cir. 2023) (relying on 2021 Supreme Court decision concerning level of generality in clearly established analysis of 2018 incident); *Frasier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021) (same for 2018 Supreme Court decision and 2014 incident).

[8] The district court faulted the Estate for failing to cite this published authority. But courts analyzing clearly established law—both district and appellate—are not limited to authority cited by the parties. *See Elder v. Holloway*, 510 U.S. 510, 511–12 (1994) (explaining "appellate review of qualified immunity dispositions is to be

Although there are factual variations between those cases and the one at hand, in all, "a reasonable officer would have recognized that the plaintiff was unarmed and nonthreatening." *Clerkley*, 121 F.4th at 1366–67 (synthesizing *Zuchel*, *Zia Trust*, *Walker*, and others). And we need not find "a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Finch*, 38 F.4th at 1243 (quoting *Zia Tr. Co.*, 597 F.3d at 1155).

Viewing the disputed facts in the Estate's favor, Shelby violated Crutcher's clearly established constitutional rights, so we reverse the district court's grant of summary judgment based on qualified immunity and remand for further proceedings. We also direct the district court to reconsider its dismissal of the Estate's state-law wrongful-death claim, since the district court only declined supplemental jurisdiction because no federal claims remained. *See Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005) (directing district court to reconsider remand of state-law claims to state court after reversing summary judgment on federal claim).

## II. *Monell* Claims Against the City

The Estate next argues that the district court erred in dismissing its *Monell* claims against the City for failure to state a claim under Federal Rule of Civil

---

conducted in light of all relevant precedents"); *Hardy v. Rabie*, 147 F.4th 1156, 1168 (10th Cir. 2025) (applying same principle to district courts). Of course, courts remain free to apply traditional waiver and forfeiture principles if the clearly established issue is inadequately briefed. *See, e.g.*, *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020).

Procedure 12(b)(6). Our review is de novo. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019). In assessing whether a plaintiff states a claim for relief, "we 'must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.'" *Id.* (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)). But "mere labels and conclusions and a formulaic recitation of the elements of a cause of action will not suffice." *Id.* (cleaned up) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)).

"[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts,'" meaning "[t]hey are not vicariously liable . . . for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). So, "[t]o establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1227 (10th Cir. 2025) (quoting *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009)). There are five types of qualifying municipal policies or customs:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well[-]settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or

> supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (quoting *Waller*, 932 F.3d at 1283).

The Estate's three *Monell* claims all fall into the fifth category: the City failed to properly train Shelby, failed to properly screen Shelby before hiring her, and failed to investigate or discipline officers for misconduct, thereby creating a "code of silence."[9] To state a claim for § 1983 municipal liability on any of these theories, the Estate must show (1) a policy or custom—that is, the City provided "deliberately indifferent training or supervision"; and (2) causation—in other words, a close relationship between the practice and the constitutional violation, such "that 'the municipality was the moving force behind the injury alleged.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (cleaned up) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

As a threshold matter, the Estate argues the district court improperly applied a heightened pleading standard to its *Monell* claims. As the Estate notes, federal courts

[9] The Estate's *Monell* claims suffer from a frustrating lack of clarity. Its operative complaint asserted seven federal claims against the City: two premised on the officers' use of excessive force; one premised on equal protection; one premised on due process; two clearly labeled as *Monell* claims, asserting deliberately indifferent policies and practices; and one alleging deliberately indifferent hiring. But on appeal, the Estate's opening brief argues only *Monell* claims related to the use of excessive force, focusing on the City's training, hiring, and disciplinary practices and policies (often without any clear delineation between theories). And although the Estate's reply brief includes a footnote purporting to also appeal the equal-protection *Monell* claim, it has waived any such argument by failing to argue its merits in either brief. *See Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012). We therefore narrow our focus to the three theories of *Monell* liability that the Estate adequately presents on appeal.

cannot apply "more stringent . . . pleading requirements . . . in civil[-]rights cases alleging municipal liability." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993);[10] *see also* Fed. R. Civ. P. 8(a) (requiring "short and plain statement of the claim showing that the pleader is entitled to relief").

Even so, in the *Monell* context, simply alleging the existence of a policy is not enough to state a claim. *See Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017) (describing such a pleading as "the type of 'formulaic recitation of the elements of a cause of action' that is insufficient to meet the *Twombly* pleading standard" (quoting *Twombly*, 550 U.S. at 555)). A plaintiff must include "factual allegations sufficient to support a plausible inference" that a policy caused his injuries. *Id.*

That is exactly the standard that the district court applied. It explained that a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." App. vol. 1, 199 (quoting *Iqbal*, 556 U.S. at 678). And it described what would fall short: "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (cleaned up) (quoting *Iqbal*, 556 U.S. at 678). Contrary to the Estate's assertion, the district court did not hold it to a heightened pleading standard.

[10] *Leatherman* predated the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As such, it relied on the now-outdated notion of "notice pleading." *Leatherman*, 507 U.S. at 168. We apply the pleading standard as clarified by *Twombly* and *Iqbal*.

Nor did the district court err in dismissing the *Monell* claims, which we now examine in detail.

**A. Failure to Train**

Beginning with its failure-to-train claim, the Estate suggests that the district court erred in concluding that it didn't "articulate what the training policies and procedures were[] or explain how they were deficient." App. vol. 1, 202. According to the Estate's operative complaint, despite Tulsa's "history of high rates of excessive[-]force complaints" and "racially disparate outcomes in . . . the use of force against [Black people]," the City failed to train officers in deescalating situations and interacting with individuals with diminished capacity—even after the Tulsa Mayor's Policy & Community Coalition advised TPD of the need for body cameras and implicit-bias training. *Id.* at 121. As a result, the Estate alleged, TPD developed a "culture of 'you hesitate and you die'" and fostered the perception that "there is a war against cops." *Id.* at 120. In further support, the Estate cited comments Shelby made in a television interview crediting her training for the decision to shoot Crutcher.

Recall that to state a failure-to-train claim, a plaintiff must demonstrate deliberate indifference. *Waller*, 932 F.3d at 1283–84. Doing so depends on showing the municipality "ha[d] actual or constructive notice that its action or failure to act [wa]s substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm." *Schneider*, 717 F.3d at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly

be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. To establish constructive notice, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'" *Id.* (quoting *Brown*, 520 U.S. at 409).

Here, the Estate fails to plausibly allege "[a] pattern of similar constitutional violations by untrained employees." *Id.* The only support for such a pattern is the Estate's allegation that TPD has a "history of high rates of excessive[-]force complaints." App. vol. 1, 121. But without more information about prior incidents—including whether constitutional violations occurred—we can't determine their similarities to the case at hand or say that the City was on notice that its training was deficient. *Cf. Connick*, 563 U.S. at 62–63 (concluding that plaintiff could not show deliberate indifference where prior incidents were not similar to the violation at issue).

True, in a "narrow range of circumstances," constructive notice can be found without a pattern if "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Barney*, 143 F.3d at 1307–08 (quoting *Brown*, 520 U.S. at 409). For example, "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," so failing to train them on "the constitutional limitations on the use of deadly force" could constitute deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). But the Estate's allegation that the City failed to train officers on de-escalation and related matters "does not fall within the narrow range of *Canton*'s

hypothesized single-incident liability." *Connick*, 563 U.S. at 64. Instead, the Estate takes issue with "the nuance of the allegedly necessary training" rather than the complete absence of training that *Canton* imagined. *Id.* at 67. Thus, because the Estate did not plausibly allege deliberate indifference, it failed to state a claim against the City for failure to train.

### B. Failure to Screen

Turning to the failure-to-screen claim, the Estate suggests it pleaded *Monell* liability by alleging the City neglected to adequately investigate Shelby's past. The complaint alleges that even a cursory background check would have revealed that Shelby had brandished a knife during a domestic dispute, used a shovel to damage a car, and threatened someone with violence—incidents that respectively served as the basis of a police report and two protective orders against her.

In the screening context, the Supreme Court has noted a "particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself," as "[e]very injury suffered at the hands of a municipal employee can be traced to a hiring decision in a 'but-for' sense." *Brown*, 520 U.S. at 410. To that end, "[t]he Supreme Court has made clear that the failure to conduct a sufficient background check on a job applicant is insufficient in itself to satisfy the deliberate[-]indifference element." *Waller*, 932 F.3d at 1285. Instead, deliberate indifference occurs "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the

plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Brown*, 520 U.S. at 411.

Here, the allegations of violence in Shelby's past may suggest her use of force against Crutcher was more likely. But the applicable legal standard is stricter than that. It is not plausible to infer from three incidents that resulted in allegations of violent or aggressive behavior—none of which resulted in physical injury or conviction—that a "*plainly obvious consequence* of the decision to hire" Shelby would be "the deprivation of a third party's federally protected right." *Id.* (emphasis added). We therefore conclude that the Estate failed to plead a plausible failure-to-screen claim.

### C. Failure to Investigate or Discipline

The Estate's final premise for excessive-force liability relates to the City's allegedly deficient use-of-force investigations and officer discipline, which it says created a "code of silence" around misconduct. In support of this claim, the Estate points to its allegations that TPD inadequately investigates (or refuses to investigate) officer-misconduct complaints; discourages the district attorney from pursuing criminal investigations into officer-involved shootings; found a policy violation in just one of 61 deadly force incidents in an eight-year period; never disciplined Shelby or any other officers present at the scene of Crutcher's shooting; and failed to implement mandatory body cameras.

These allegations fall short of showing causation. Although the Estate plausibly alleges that neither Shelby nor any officer at the scene faced discipline,

"[r]arely if ever is 'the failure of a police department to discipline in a specific instance an adequate basis for municipal liability under *Monell*.'" *Schneider*, 717 F.3d at 777 (cleaned up) (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993)). Indeed, "[b]asic principles of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation." *Waller*, 932 F.3d at 1289 (cleaned up) (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)). As for the allegations of prior investigative and disciplinary failures, the Estate fails to allege that any of the misconduct complaints or officer-involved shootings involved excessive force, rendering their relevance purely speculative. Thus, the Estate's disciplinary "allegations in this case are too general, encompassing too 'wide a swath of conduct,' to 'nudge [its] claims across the line from conceivable to plausible.'" *Id.* (cleaned up) (quoting *Khalik*, 671 F.3d at 1191).

In sum, the district court correctly dismissed the Estate's *Monell* claims for excessive force based on failure to train, screen, and investigate or discipline officers.

**Conclusion**

Because the district court failed to view the facts in a light most favorable to the Estate and defined clearly established law at too granular a level, we reverse the grant of summary judgment to Shelby. But we affirm the district court's dismissal of the Estate's various *Monell* claims because they fail to plausibly state municipal liability.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

March 30, 2026

Lee Ross Crain
Aiyanna W. Isom
Mary Donna Otoo
Karin S Portlock
Julia Turner Ross
Gibson, Dunn & Crutcher
200 Park Avenue, 56th Floor
New York, NY 10166-0193

Damario D. Solomon-Simmons
SolomonSimmonsLaw
601 South Boulder Avenue, Suite 602
Tulsa, OK 74119

**RE: 24-5058, Manning v. City of Tulsa, et al**
Dist/Ag docket: 4:17-CV-00336-EFM-SH

Dear Counsel:

Attached is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Jessica Lauren Dark
Jeffrey C. Hendrickson
Robert S. Lafferrandre
Randall James Wood
Scott B. Wood

CMW/at

**Mary Montgomery**

| | |
|---|---|
| **From:** | ca10_cmecf_notify@ca10.uscourts.gov |
| **Sent:** | Monday, March 30, 2026 11:34 AM |
| **To:** | CM-ECF Intake OKND |
| **Subject:** | 24-5058 Manning v. City of Tulsa, et al "Case termination for opinion" (4:17-CV-00336-EFM-SH) |

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

**Tenth Circuit Court of Appeals**

**Notice of Docket Activity**

The following transaction was entered on 03/30/2026 at 10:31:12 AM Mountain Daylight Time and filed on 03/30/2026

| | |
|---|---|
| **Case Name:** | Manning v. City of Tulsa, et al |
| **Case Number:** | 24-5058 |
| **Document(s):** | Docket Entry #62 |

**Docket Text:**
[11268323] Reversed in Part and Affirmed in Part. Terminated on the merits after oral hearing. Written, signed, and published. Judges Hartz, McHugh, and Moritz (authoring judge). Mandate to issue. [24-5058]

**Notice will be electronically mailed to:**

Lee Ross Crain: lcrain@gibsondunn.com, lee-r-crain-1925@ecf.pacerpro.com
Mrs. Jessica Lauren Dark: jdark@piercecouch.com, bdryer@piercecouch.com, kodonnell@piercecouch.com
Jeffrey C. Hendrickson: jhendrickson@piercecouch.com, jgirouard@piercecouch.com, cahtone@piercecouch.com
Aiyanna W. Isom: aisom@gibsondunn.com, aiyanna-isom-1024@ecf.pacerpro.com
Mr. Robert S. Lafferrandre: rlafferrandre@piercecouch.com, kodonnell@piercecouch.com
Mary Donna Otoo: motoo@gibsondunn.com
Karin S Portlock: kportlock@gibsondunn.com
Julia Turner Ross: jross@gibsondunn.com
Damario D. Solomon-Simmons: dss@solomonsimmons.com, eweinberg@solomonsimmons.com
Mr. Randall James Wood: rwood@piercecouch.com, lsheppard@piercecouch.com
Mr. Scott B. Wood: okcoplaw@aol.com

The following document(s) are associated with this transaction:
**Document Description:** Opinion
**Original Filename:** 24-5058.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1104938855 [Date=03/30/2026] [FileNumber=11268323-0]
[14a83d6c858c17b3f91daffa348a0c3ff3a314feb02a2020d4a8d7c9f66c760cd54da8b7a4113a71108b0f
c07775dd137efabd092b08ffe616a0198a24512f38]]

**Document Description:** Opn Cover Letter
**Original Filename:** /opt/ACECF/live/forms/245058_11268323_217.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1104938855 [Date=03/30/2026] [FileNumber=11268323-1]
[d94b5b79d2433fcca9ba7f5164fa07d06d83e53cf39c2f42aeb040465fb43a7f29d890fa304383f6683cf11
3f27d7b0a8cc8719b26f4325723fb77df51c6e0b1]]
**Recipients:**

- Lee Ross Crain
- Mrs. Jessica Lauren Dark
- Jeffrey C. Hendrickson
- Aiyanna W. Isom
- Mr. Robert S. Lafferrandre
- Mary Donna Otoo
- Karin S Portlock
- Julia Turner Ross
- Damario D. Solomon-Simmons
- Mr. Randall James Wood
- Mr. Scott B. Wood